Filed 6/13/13  Pedraza v. Silverman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GEORGETTE PEDRAZA et al., | D059638 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2008-00081565-CU-MM-CTL) |
| MICHAEL SILVERMAN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Judith F. Hayes, Judge.  Affirmed.

Hayworth and Sussman and Nancy Sussman for Plaintiffs and Appellants.

Carroll, Kelly, Trotter, Franzen & McKenna, Richard D. Carroll, Lisa M. Iulianelli and David P. Pruett for Defendants and Respondents.

This medical malpractice action arises out of a robotically assisted laparoscopic surgery performed by Michael Silverman, M.D., on Georgette Pedraza.  After an eight-day trial, the jury found in favor of Dr. Silverman; his colleague, Sheryl Saenz, M.D.; and their employer, the Regents of the University of California (Regents) (collectively

defendants).  On appeal, Georgette Pedraza and her husband, Luis Pedraza, (together, the Pedrazas) assert the court erred by (1) striking their statement of disqualification of the trial judge; (2) granting Dr. Silverman's motion in limine to exclude a statement of deficiency issued by the California Department of Health Services (DHS or Department); (3) making improper rulings during the trial testimony of both parties' expert witnesses; (4) denying their motion for mistrial or, alternatively, failing to adequately admonish the jury concerning documents not entered into evidence; (5) making certain rulings during jury selection; and (6) granting the Regents' motion for nonsuit.  We affirm.

FACTUAL AND PROCEDURAL SUMMARY

On July 19, 2007, Georgette Pedraza underwent a robotically assisted laparoscopic surgery at the University of California, San Diego (UCSD) Medical Center, which is owned and operated by the Regents.  The surgery was performed by Dr. Silverman to remove a large mass near Mrs. Pedraza's left fallopian tube and ovary and to confirm the mass was benign.  Prior to performing the procedure, Dr. Silverman estimated he had done 15 robotically assisted laparoscopic surgeries and hundreds of laparoscopic surgeries.  During the procedure, Dr. Silverman removed the large mass and confirmed it was endometriosis, not cancer.  While operating, a portion of the scalpel dislodged and fell into Mrs. Pedraza's abdomen.  The surgery lasted more than six hours, including one hour to retrieve the dislodged portion of the instrument.

With no complications, Mrs. Pedraza was expected to go home the day following surgery.  Late the night of the surgery, however, she developed a fever that continued into the next morning.  A chest X-ray revealed pneumonia, and she was treated with

2

antibiotics.  When Dr. Silverman saw Mrs. Pedraza at 3:00 p.m. the day after surgery, her condition had improved and her fever was gone.  Dr. Silverman left the hospital later that afternoon, a Friday, and turned Mrs. Pedraza's primary care over to Dr. Saenz, the on-call attending physician for the weekend.  Friday evening, Dr. Saenz was alerted by a medical resident that Mrs. Pedraza's fever had returned and her overall condition had deteriorated.  Dr. Saenz requested a number of tests, which confirmed the earlier diagnosis of pneumonia, but were inconclusive as to additional causes of Mrs. Pedraza's illness.

Mrs. Pedraza's condition improved during the day on Saturday, but that evening significantly and suddenly worsened.  Her oxygen saturation level dropped and her heart rate and rhythm became abnormal.  As a result, Mrs. Pedraza was transferred to the intensive care unit and diagnosed with septic shock.  The source of the infection causing sepsis, however, was not clear.  Additional tests were inconclusive.  Dr. Silverman returned to the hospital early Sunday evening.  He accompanied Mrs. Pedraza to radiology for additional tests and ascertained for the first time there was a perforation in Mrs. Pedraza's colon causing the serious infection that now threatened her life.

Once he discovered the perforation, Dr. Silverman discussed the situation with Mrs. Pedraza's family and obtained their consent to operate.  He performed an emergency laparotomy (or open surgery) to repair the perforation late Sunday evening.  Because of damage to the bowel, Dr. Silverman created a colostomy, which was reversed a year later.  After this second surgery, Mrs. Pedraza remained in the hospital for 32 days.  Once home, she was visited by a nurse every other day who assisted with managing the

3

surgical wound and with the care of the colostomy. Before the reversal of the colostomy, Mrs. Pedraza was hospitalized a number of times for bowel obstruction.

In April 2008 the Pedrazas sued for medical malpractice and loss of consortium. The case was brought to trial in February 2011. The trial focused on whether defendants' conduct (preoperatively in recommending the robotically assisted laparoscopic procedure, Dr. Silverman's actions during the procedure, and postoperatively in diagnosing and treating the perforation) fell below the standard of care, and the timing of the perforation of the bowel. The Pedrazas introduced the expert testimony of Arnold Zeiderman, M.D., an experienced gynocological surgeon, who opined the perforation occurred at the time of Mrs. Pedraza's initial surgery and Dr. Silverman and Dr. Saenz breached the applicable standards of care. Defendants presented the expert testimony of Lynn Kowalski, M.D., an experienced gynecologic oncologist, who opined defendants did not breach the standard of care, and Brian West, M.D., a pathologist, who opined on the timing and causation of the bowel perforation.[1]

## DISCUSSION

### I. *STATEMENT OF DISQUALIFICATION*

The Pedrazas first argue the court committed reversible error by striking their statement of disqualification against Judge Judith F. Hayes. At the initial trial call in October 2010, after argument and rulings on 10 motions in limine, the Pedrazas' counsel, Nancy Sussman, questioned the judge about her relationship with Dr. Saenz: "The Court

---

[1]    We discuss additional facts throughout the opinion where relevant to a particular legal contention.

4

disclosed in the beginning that she had surgery by Dr. Saenz, one surgery. [¶] . . . [¶] And never saw since, never saw after, saw her on one occasion only. I just want to make sure that's still the case." Judge Hayes responded that was correct and her best recollection was that she met Dr. Saenz once for about 10 minutes. She also stated she "still get[s] medical care at UCSD." Sussman responded she was not aware the judge's current health care provider was the Regents and challenged the judge for cause. The court indicated it did not believe recusal was appropriate, postponed the matter, and directed Sussman to prepare a formal statement of disqualification. The Pedrazas filed the statement the following day.

On November 9, 2010, the court issued its order striking the statement of disqualification as untimely under Code of Civil Procedure section 170.4, subdivision (b). In its order the court noted Judge Hayes disclosed she was receiving healthcare through the Regents on December 4, 2008, near the outset of the case.

As a preliminary matter, the Pedrazas' claim is not cognizable on appeal. "As set forth in Code of Civil Procedure section 170.3, subdivision (d): 'The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding.' " (*People v. Panah* (2005) 35 Cal.4th 395, 444.) "Code of Civil Procedure section 170.3, subdivision (d) provides the exclusive means for seeking review of a ruling on a challenge to a judge, whether the challenge is for cause or peremptory." (*Panah,* at p. 444.) The order indicates on its face it "constitutes a determination of the question of

5

disqualification pursuant to Code of Civil Procedure, section 170.3[, subdivision] (d)" and the Pedrazas failed to file a writ of mandate within the prescribed period of time. This court, therefore, is without jurisdiction to review the order.

We also note, as the trial court found, the Pedrazas' statement was untimely. Code of Civil Procedure section 170.3, subdivision (c)(1) provides "[i]f a judge who should disqualify himself or herself refuses or fails to do so, any party may file with the clerk a written verified statement objecting to the hearing or trial before the judge . . . . The statement shall be presented *at the earliest practicable opportunity after disclosure of the facts constituting the ground for disqualification*." (Italics added; see also *Tri Counties Bank v. Superior Court* (2008) 167 Cal.App.4th 1332, 1337 ["This strict promptness requirement is not to be taken lightly, as a failure to comply constitutes forfeiture or an implied waiver of the disqualification."].)

Judge Hayes disclosed she received health care from the Regents nearly two years before the Pedrazas filed their statement of disqualification. No new information concerning her relationship with defendants was disclosed during trial call and the Pedrazas presented no explanation for their delay.[2] Accordingly, the challenge was untimely and the court did not err by striking the statement of disqualification.

---

2 To avoid this waiver, the Pedrazas state, "[T]here is no waiver of an objection based upon personal bias toward a party absent a written stipulation" and cite Code of Civil Procedure section 170.3, subdivision (b)(2)(A). That provision, however, precludes a trial judge who admits disqualification is appropriate from obtaining a waiver of disqualification from the parties permitting him to preside where the judge has a personal bias or prejudice concerning a party. (Code Civ. Proc., § 170.3, subd. (b)(2)(A).) It does

## II. *EVIDENTIARY RULINGS*

The Pedrazas contend the trial court committed reversible error with respect to several evidentiary rulings before and during trial. They argue the court erred by (1) granting defendants' motion in limine to exclude a deficiency citation issued by the DHS, (2) precluding additional examination of a defense expert, and (3) limiting the testimony of their expert.

"The trial court is 'vested with broad discretion in ruling on the admissibility of evidence.' [Citation.] '[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion.' [Citation.] ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citation.]' [Citation.] Moreover, even where evidence is improperly excluded, the error is not reversible unless ' "it is reasonably probable a result more favorable to the appellant would have been reached absent the error." ' " (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431-1432.)

### A. *Department of Health Services*

Defendants brought a motion in limine to exclude a citation, or "statement of deficiency," issued by the DHS. The citation details an investigation by the DHS that was conducted after Sussman reported Mrs. Pedraza's surgery to the Department. The

---

not address a party's waiver of the right to seek disqualification after learning of facts indicating bias.

7

investigative report, dated April 2008, concludes "the hospital failed to ensure its policy and procedure relative to the documentation of clinical privileges and proctoring requirement for physicians who were granted surgical privileges for robotically assisted surgical procedures [were] implemented."

Defendants argued the citation was irrelevant under Evidence Code section 350 and also should be excluded under Evidence Code section 352 because it created a "substantial danger of misleading the jury into equating regulatory 'deficiencies' . . . to a 'breach' of the standard of care . . . ." Defendants explained that at the time of Mrs. Predraza's surgery the hospital did not have a distinct delineation of privilege (DOP or proctoring requirement) for the use of the robotic system. Instead, surgeons with advanced laparoscopic experience and evidence of training with the system were permitted to use the device. The "Provider's Plan of Correction" contained in the citation states the hospital began implementation of a separate DOP for the robotic system in September 2007 and expected it to be finalized in April 2008.

In response, the Pedrazas argued the DHS citation was relevant to the alleged corporate negligence of the Regents because it showed the hospital's failure to require proctoring fell below the applicable standard of care. The Pedrazas also pointed to the statement of Dr. Silverman in the citation that in the past "he had experienced failure of the anvil attachment twice during a laparoscopic surgery." They argued this statement was relevant to the standard of care, a lack of informed consent, and Dr. Silverman's credibility because his deposition testimony was that the anvil had broken just once before the equipment failure in Mrs. Pedraza's surgery.

8

The trial court excluded the citation, finding its probative value was substantially outweighed by its likelihood of confusing the jury. The court noted the DHS had access to information not available to the parties and that the significance of the citation and the precise deficiency found by the DHS was unclear. The court also specifically stated, "You can't take a rule that was put in place after a problem occurred and then say there they were cited for violating the rule when the problem occurred. That doesn't make any sense." The court concluded the introduction of the citation would result in a time-consuming trial of a regulatory deficiency case "in the middle of a malpractice case."

Evidence Code section 352 gives the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The statute " 'requires consideration of the relationship between the evidence and the relevant inferences to be drawn from it, whether the evidence is relevant to the main or only a collateral issue, and the necessity of the evidence to the proponent's case as well as the reasons recited in [Evidence Code] section 352 for exclusion. [Citation.] The more substantial the probative value of the evidence, the greater the danger of the presence of one of the excluding factors that must be present to support an exercise of trial court discretion excluding the evidence.' " (*Hinson v. Clairemont Community Hospital* (1990) 218 Cal.App.3d 1110, 1123-1124.) "A trial court's discretionary ruling under this statute ' "must not be disturbed on appeal except on a showing that the court exercised its

discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Williams* (2008) 43 Cal.4th 584, 634-635.)

There was no abuse of discretion here. The probative value of the DHS citation was limited by inconsistency within the document itself. Without reference to a particular time frame, the citation states generally that the "hospital failed to ensure its policy and procedure relative to the documentation of clinical privileges and proctoring requirement for physicians who were granted surgical privileges for robotically assisted surgical procedures [were] implemented." The hospital's response within the document, however, states there was no specific proctoring or related documentation requirement in place at the time of Mrs. Pedraza's surgery. In addition, the citation was not the only evidence available to show the hospital did not have a specific proctoring requirement at the time of the incident and that Dr. Silverman had not been proctored, or to show Dr. Silverman had previously experienced failure of the anvil attachment. In fact, testimony concerning these facts was heard by the jury. Dr. Silverman testified concerning the prior equipment failure.[3] Indeed, it was not disputed that Dr. Silverman was not proctored with respect to the robotic procedure or that the hospital did not have such a proctoring requirement. Both the Pedrazas' expert and Dr. Silverman testified he was not proctored before Mrs. Pedraza's surgery. Importantly, exclusion of the citation did not foreclose the

_____

[3] The Pedrazas argue they should have been permitted to use the DHS citation to impeach Dr. Silverman's testimony that the anvil had broken just once before Mrs. Pedraza's surgery and not twice as suggested by the citation. Defendants contended, however, that the reference to two prior failures of the anvil in the citation included Mrs. Pedraza's surgery and the prior failure. This conflicting interpretation of the document weighs in favor of exclusion.

Pedrazas from introducing evidence concerning whether the applicable standard of care required proctoring.

On the other side of the scale, the citation's internal inconsistency had a strong probability of creating confusion in the minds of the jurors. As the court found, it was likely introduction of the citation would result in a time-consuming and confusing "trial within a trial" on the collateral issue of whether the hospital was actually deficient in its regulatory compliance. (See *People v. Hamilton* (2009) 45 Cal.4th 863, 930 [evidence with limited probative value properly excluded under Evidence Code section 352 where presentation would result in time-consuming "mini-trial" on the evidence]) The trial court properly conducted the applicable balancing test with respect to the citation and its decision to exclude the evidence was not "arbitrary, capricious or patently absurd." (*People v. Williams*, *supra*, 43 Cal.4th at p. 634.)

B. *Examination of Dr. West*

The Pedrazas argue that the trial court erred by allowing defense expert Dr. West to testify beyond the scope of his deposition and by precluding additional cross-examination of him. Neither contention is supported by the record.

1.

During trial, defense counsel, Richard Carroll, informed Sussman he intended to call Dr. West, a pathologist retained by defendants and deposed by Sussman. Although designated on the trial witness list, Carroll previously stated Dr. West would not be called as a witness. However, after Dr. Zeiderman testified he had relied on the deposition testimony of Dr. West concerning the cause of the perforation to Mrs. Pedraza's bowel in

11

forming his own opinions, Carroll decided to call Dr. West to refute that testimony. The Pedrazas did not object to Dr. West taking the stand and Sussman agreed a total of two hours for his testimony was sufficient. Dr. West arranged to come to San Diego from Connecticut to testify and then to leave San Diego the same day as his testimony in order to meet an existing obligation the following day in Texas. In order to make his flight, Dr. West needed to leave the court by 11:20 a.m.

During his testimony, Dr. West opined, over Sussman's objections, it was likely an "injury happened during the surgery but [the colon] didn't perforate until sometime thereafter." He noted this is a "relatively common circumstance . . . with colonic injuries." Dr. West went on to testify the most probable scenario was that "the colon was damaged during the process of dissecting away the . . . adhesions which was done by electrocautery, and that caused damage to the colon wall, which weakened it, but didn't cause a perforation at that time. And that at some stage later on when perhaps there was an increase in the pressure within the . . . colon . . . the perforation occurred." Dr. West further explained that if the bowel is injured, "when one attempts to have a bowel movement that increases the [] pressure within the bowel and actually causes a rupture to occur in an area that's been weakened."

At the conclusion of the trial day, the Pedrazas moved for a mistrial, arguing this testimony should have been excluded under Code of Civil Procedure section 2034.300 because Dr. West did not mention a "bowel movement" at his deposition. Citing *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, the Pedrazas argued Sussman's objections to this testimony should have been sustained because the opinions

12

were not expressed by Dr. West at his deposition. When the *Kennemur* objection was raised, defendants responded by pointing to Dr. West's deposition testimony in which he was asked: "With respect to a patient with peritonitis as a result of an acute bowel injury will you expect such patient to be up and walking around in the immediate aftermath of a bowel injury?" Dr. West responded, "Patients with acute peritonitis from bowel damage or disruption get very severe abdominal pain and are usually very sick in a very short time." Dr. West also testified during his deposition that he had seen "hundreds of cases of peritonitis due to injuries in the large and small intestines over the years, literally hundreds." Additionally, his deposition testimony included his opinion that it was extremely unlikely the portion of the instrument that broke off caused the perforation to Mrs. Pedraza's bowel during surgery.

The trial court denied the Pedrazas' motion for mistrial, finding the new statements were within the scope of Dr. West's deposition testimony. The court pointed to Dr. Zeiderman's testimony that he "derive[d] from Dr. West's opinion that . . . the surgery contributed to the perforation."

"[A]n expert may be precluded from testifying at trial on a subject that was not described in his expert witness declaration." (*DePalma v. Rodriguez* (2007) 151 Cal.App.4th 159, 164). Further, where an expert testifies at his deposition that he has no opinions other than those offered, the expert may be barred from expressing additional opinions at trial. (*Jones v. Moore* (2000) 80 Cal.App.4th 557, 564-566.) Such testimony is properly excluded under Code of Civil Procedure section 2034.300 because, in effect, the expert is not made available for deposition as to the additional opinions offered at

13

trial.[4]  (*Ibid*.)  This exclusion, however, does not apply where the expert's trial testimony merely expands the conclusions stated in his deposition.  (*DePalma v. Rodriguez, supra*, 151 Cal.App.4th at pp. 164-165.)

The trial court's decision to allow Dr. West to express his opinion concerning the timing of the perforation of Mrs. Pedraza's bowel was not an abuse of discretion.  The deposition testimony of Dr. West proffered by defendants in response to the Pedrazas' *Kennemur* objection, as well as the deposition testimony referenced by Dr. Zeiderman, directly concerned whether the perforation was made during surgery or occurred sometime after.  The opinion expressed by Dr. West during trial that the perforation did not occur during surgery was not outside the scope of his deposition, nor did it unfairly surprise the Pedrazas.

Dr. West's opinion that increased pressure, or peristalsis, in the colon caused or contributed to the actual perforation also fell within the general scope of his deposition testimony.  As noted, at his deposition Dr. West stated his opinion that it was likely that Mrs. Pedraza's bowel was weakened by the trauma of surgery, but that the actual perforation leading to septic shock occurred sometime after surgery.  Even if Dr. West did not state specifically during his deposition that pressure in the bowel, or a "bowel movement," was a contributing cause of the actual perforation, this conclusion was part

---

[4]    Code of Civil Procedure section 2034.300 provides that "on objection of any party who has made a complete and timely compliance with Section 2034.260 [governing the exchange and substance of expert witness declarations], the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to . . . [¶] . . . [¶] (d) Make that expert available for a deposition . . . ."

14

and parcel of his opinion concerning the causation and timing of the perforation. As evidenced by Dr. Zeiderman's testimony, from Dr. West's deposition the Pedrazas were aware that Dr. West held the opinion that the colon was injured, but not perforated, during the surgery. Dr. West's later testimony that peristalsis was another contributing factor to the perforation was simply a facet of his opinion as to how the perforation occured. (See *DePalma v. Rodriguez, supra,* 151 Cal.App.4th at p. 165 [not error to allow expert's testimony where it "constituted merely an expanded description and interpretation of the conclusions stated in his deposition testimony"].)[5]

2.

The Pedrazas also contend the court improperly limited their examination of Dr. West. As noted above, the Pedrazas' counsel agreed at the outset two hours was sufficient for Dr. West's testimony. In order to allow for a morning break during the session, the court indicated each side would have 50 minutes to examine Dr. West. The court warned a showing of good cause would be required for either side to obtain additional time for further questioning. At the conclusion of the trial day, after Dr. West left for Texas and the court's denial of the Pedrazas' motion for mistrial, Sussman stated she had additional areas of examination she wanted to cover with Dr. West. The court reminded Sussman a showing of good cause would be required for further examination and asked what additional areas she wanted to cover with Dr. West.

---

[5]    Dr. West's statements were also not prejudicial to the Pedrazas. Similar testimony by defendants' other expert, Dr. Kowalski, was elicited by Sussman during trial. Dr. Kowalski testified that the "peristaltic action of moving the bowels could have impacted the time that perforation occurred."

15

Sussman pointed to just one question and answer from Dr. West's deposition that she wanted to ask and follow up on:  Whether a patient with peritonitis would be able to pass fecal material, to which Dr. West responded it was a clinical area he was not in a good position to answer as a pathologist.  The trial court did not issue a ruling, indicating it believed Sussman had pursued this line of questioning, but wanted to review the transcript before making a decision.  The Pedrazas did not raise the issue again at trial and the court never issued a ruling. The transcript shows, however, Sussman did question Dr. West concerning whether, during his deposition, he had testified about a bowel movement.

"Generally, 'the trial court has the power to rule on the admissibility of evidence, exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative and expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact.' [Citation.]  Nonetheless, in exercising this power, the trial court may not infringe the parties' 'fundamental right to a full and fair hearing.' " (*Hernandez v. Kieferle* (2011) 200 Cal.App.4th 419, 438.)  With respect to the limitation imposed on Dr. West's testimony, the trial court acted within its discretion to enforce the parties' time estimates.  When the court requested the Pedrazas proffer areas of inquiry that required further examination, the one line of questioning raised was an area that was

16

already covered.  There was no prejudicial error in the trial court's determination to allow Dr. West to leave.[6]

C. *Examination of Dr. Zeiderman*

The Pedrazas next argue they were improperly restricted from presenting testimony from Dr. Zeiderman concerning (1) the use of a robot to perform laparoscopic surgery and (2) Dr. West's opinions concerning the pathology of Mrs. Pedraza's injury. These arguments are without merit.

1.

With respect to the court's limitation of Dr. Zeiderman's testimony about robotic surgery, the Pedrazas point to a series of three questions where the court sustained defendants' objections precluding Dr. Zeiderman from answering:  "One of the drawbacks of using robotic surgery is that you don't feel how much tension or how much

---

[6]     The cases the Pedrazas cite in support of their position, *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281 (Carlsson) and *Abbott v. Mandiola* (1999) 70 Cal.App.4th 676 (*Abbott*), are inapposite.  In *Carlsson*, the appellate court held due process was violated where "the trial judge literally walked out of the courtroom in midtrial" in the middle of counsel's questioning of a witness, without any warning. (*Carlsson, supra*, 163 Cal.App.4th at p. 293.)  Further, the testimony cut off by the court in *Carlsson* was taking no longer than the parties had estimated. (*Id*. at pp. 285–286.)  The situation here, a time limit agreed to by the parties on one witness, is far different. (*See also Hernandez v. Kieferle, supra*, 200 Cal.App.4th at p. 438 [distinguishing *Carlsson* and concluding that where the court acted "only to enforce the parties' time estimates and agreements regarding evidence," the court did not improperly limit witness testimony].)
       *Abbott* concerns the unrelated issue of whether a motion for sanctions based on a mistrial must be decided by the same judge who declared the mistrial. (*Abbott*, 70 Cal.App.4th at pp. 683-684.) After noting in the factual summary that the respondent had opposed the motion for sanctions on the grounds that a mistrial was inevitable because the trial judge was predisposed to grant a mistrial if the trial exceeded the parties' estimate of eight days, the court observed in dicta that exceeding a trial estimate is not a basis for a mistrial. (*Id*. at p. 680, fn. 5.)

17

pressure your instrument is making on the organ in which it's directed, correct?"; "Is there a danger in using instruments during the robotic surgery . . . .?"; and "Using the laparoscopic surgery . . . , is it the same risk as the robotic surgery?"

Although Dr. Zeiderman had not done a robotic procedure (6 RT 968:18)!, it was not disputed he was a qualified medical expert and had reviewed medical literature concerning this laparoscopic technique. Sustaining these objections, therefore, was arguably error. (See *Brown v. Colm* (1974) 11 Cal.3d 639, 644 ["[T]here is no question that a professional physician may rely upon medical texts as the basis for his testimony."]) However, we see no prejudice to the Pedrazas in the court's rulings. Immediately after sustaining the objections, the court reversed itself and permitted Dr. Zeiderman to respond to the same inquiry: "Q. Is there a risk in the laparoscopic surgery in breaking instruments because you don't—you're not able to feel the pressure of the instrument on the organ? [¶] A. That's one of the—one of the problems with working with these instruments, particularly the robot, because the instrument is not in your hand."

2.

The Pedrazas argue it was prejudicial error for the court to preclude Dr. Zeiderman from testifying concerning "pathology reports from the Regents, which in turn relate to the material issue of the cause of the [Mrs. Pedraza's] injuries." This argument is also not supported by the record. During direct examination of Dr. Zeiderman, Sussman attempted to elicit testimony concerning an error in the pathology report prepared by

18

UCSD that Dr. West pointed out during his deposition.  The court sustained defendants' hearsay objections to this testimony.

Expert witnesses are "entitled to rely upon reasonable hearsay" (*People v. Campos* (1995) 32 Cal.App.4th 304, 307), and Dr. Zeiderman's use of Dr. West's deposition testimony as a basis for his opinions was not inappropriate.  (Evid. Code, § 801, subd. (b).)  "On direct examination, the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion." (*Campos*, at p. 308.)  However, "[a]n expert witness may not, on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts.  ' " 'The reason for this is obvious.  The opportunity of cross-examining the other doctors as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse.' " ' "  (*Ibid*.)

The record does not support the Pedrazas' contention that the court improperly limited Dr. Zeiderman's testimony with respect to Dr. West's opinions.  Dr. Zeiderman was not generally precluded from testifying concerning the UCSD pathology report.  Instead, the court properly precluded Dr. Zedierman from revealing hearsay opinions about the report expressed by Dr. West during his deposition.[7]

_____

[7]     As noted, at the time of Dr. Zeiderman's testimony, the defense did not anticipate calling Dr. West as a witness.  Once the defense called Dr. West the Pedrazas had the opportunity to examine him directly concerning the error he found in the initial pathology report.  As a result, there was no harm caused by their inability to offer that evidence through Dr. Zeiderman.

## III. *HOSPITAL RECORDS NOT ENTERED INTO EVIDENCE*

Next, the Pedrazas contend a mistrial, or at minimum a curative admonition, was necessary after defense counsel held records in front of the jury purportedly from the hospital where Dr. Zeiderman practiced. Again, the record does not support this contention.

During his cross-examination, Carroll questioned Dr. Zeiderman about his surgical experience. Carroll specifically asked: "[S]o lawyers like me that want to know the number of surgeries that doctors like you do really do from, let's say, 2004 to 2011, we can just subpoena the business records department of the hospital, and they take statistics on doctors like you as to how many surgeries you really do, right?" Dr. Zeiderman responded: "I know you've been trying to find out how many cases I've done. You might have just asked me. [¶] . . . [¶] I would have been happy to show you my records[;] I keep them." Carroll then asked if it was correct that since 2004 Dr. Zeiderman had performed 32 procedures as the primary surgeon and had assisted in 108 procedures. Dr. Zeiderman disagreed with those numbers, stating he believed they were too low. During this line of questioning the court reminded the jury that "the attorneys' questions aren't evidence. They're important only as they enable you to understand the answer."

After moving on to other areas of inquiry, Carroll returned to Dr. Zeiderman's experience: "[B]y the way, I promised you, doctor, that I would show you records from the actual hospital where you do most of your work. So I'm going to do that now." While the court reporter marked the exhibit, Sussman objected on the grounds of authenticity and stated she had never seen the document before. The court ordered

20

Carroll to give Sussman the opportunity to review the documents before using them. Carroll conceded, stating, "Fair enough. I'll wait until the break. [¶] . . . [¶] . . . and we'll go back to those documents." At the next break in the proceedings, Sussman objected again, but the court declined to address the issue. Carroll never returned to the document and it was not entered into evidence.

Sussman raised her objection again the next morning and moved for a mistrial.[8] The court denied the motion, stating, "[T]he records were not received into evidence. Anything that's shown to a witness has to be marked. That's all that happened yesterday. I suggested to you that there is a jury instruction that deals with that. That's available to you." The following day, the court stated it would permit the Pedrazas "to submit for consideration a jury instruction relating to the document." The Pedrazas did not seek the suggested jury instruction.

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Williams* (2006) 40 Cal.4th 287, 323.)

---

[8] The Pedrazas' motion for mistrial was also based on the court's rulings limiting Dr. Zeiderman's testimony with respect to robotically assisted laparoscopic surgery and Dr. West's deposition testimony.

The court did not abuse its discretion by denying the Pedrazas' motion for mistrial. Defense counsel's line of questioning concerning Dr. Zeiderman's experience in the procedures he was opining on was appropriate. (Evid. Code, § 721, subd. (a); see also *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 796 ["It is well established that wide latitude should be allowed in cross-examining experts on their qualifications and on the reasons given for the opinions expressed."].) Further, the document that is the subject of the Pedrazas' complaint was never introduced into evidence or seen by the jury. The mere statement by Carroll that he was going to show Dr. Zeiderman the document did not by itself show Dr. Zeiderman had overstated his experience.

The Pedrazas also complain they were ambushed. They argue had the document been provided to them before Dr. Zeiderman's testimony, he could have explained any discrepancy. As noted, however, the document was never directly used to impeach Dr. Zeiderman. Further, the Pedrazas *were* provided with an opportunity to review the document and to rehabilitate Dr. Zeiderman on redirect examination. The court also specifically invited the Pedrazas to present an additional admonition about defendants' use of the document in the form of a proposed jury instruction, but they declined. This court may not substitute its judgment for that of the trial court. (See *Grimshaw v. Ford Motor Co.*, supra, 119 Cal.App.3d at p. 794 [determinations of motion for mistrial based on counsel misconduct "may not be disturbed on appeal unless they are patently wrong"].) Because there was no incurable prejudice created by defendants' conduct, the court properly denied the Pedrazas' motion for mistrial.

IV. *JURY SELECTION*

A. *Improper Racial Bias*

The Pedrazas contend the defendants impermissibly used peremptory challenges to remove two Hispanic prospective jurors. We conclude there was no error.

In ruling on a motion challenging the exercise of peremptory strikes as improperly racially biased, "the trial court follows a three-step procedure. 'First, the [challenging party] must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the [challenging party] has made out a prima facie case, the "burden shifts to the [other party] to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 904.) A litigant's justification for a peremptory challenge need not rise to the level of a challenge for cause, and even a trivial reason or hunch, if genuine and neutral, will suffice. (*People v. Lenix* (2008) 44 Cal.4th 602, 613.) A prima facie case is established "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California* (2005) 545 U.S. 162, 170.) The challenging party " 'carries the "burden of persuasion" to " 'prove . . . discrimination.' " ' " (*People v. Avila* (2006) 38 Cal.4th 491, 548).

"We review the trial court's ruling on the question of purposeful racial discrimination for substantial evidence." (*People v. Avila, supra,* 38 Cal.4th at p. 541.)

23

"It is presumed that [counsel] uses peremptory challenges in a constitutional manner, and we give deference to the court's ability to distinguish 'bona fide reasons from sham excuses.' " (*Ibid*.) If the trial court does not use the proper standard to evaluate a *Wheeler*[9] motion, however, this court must independently review the record and "'resolve the legal question whether the record supports an inference that [counsel] excused a juror on the basis of race.' " (*Avila*, at p. 554.)

During voir dire, defendants used the second of their six peremptory challenges to excuse prospective jury Mary R. Immediately thereafter, Sussman requested a sidebar conference and stated she was "concerned that Mr. Carroll is going to excuse all the Hispanics and Mexicans on this jury, and we don't have very many." The court construed the statement as a motion under *Wheeler*, noted that Mary did not appear to be Hispanic, that defendants' first peremptory was used to excuse a man of Asian heritage, and found the motion premature.

Defendants used their third peremptory to excuse Guadalupe M., whose surname was Hispanic. Sussman renewed her *Wheeler* motion. Carroll responded that Sussman's dismissal of two African-American jurors was no different than his dismissal of Guadalupe and stated, "I don't like her, and I don't like her on this jury, and that's all I have to do to explain." The court then denied the motion: "[L]ooking at what we have so far, as far as I'm able to determine, there's one challenge against someone who is of Mexican extraction. That's not enough to make a pattern or practice. I am sensitive to

---

9       *People v. Wheeler* (1978) 22 Cal.3d 258.

that. And I will be on the lookout to see if this does appear to be an attempt to exclude any racial minority from service on this jury." The jury panel that was sworn included a Hispanic male.[10]

The Pedrazas contend the court improperly required a "pattern or practice" of racially motivated challenges to establish a prima facie case. Further, they argue a prima facie case of bias was established and defendants failed to adequately rebut that showing. With respect to Mary, the trial court did not believe she was Hispanic. The Pedrazas' counsel was herself unsure of Mary's heritage, noting "I believe [she is] Hispanic. I'm not positive." The Pedrazas point to no other information before the court showing her ethnicity.[11] Without any evidence of Mary's ethnicity, the Pedrazas failed to establish a prima facie showing of bias and denial of the motion was not error.

---

[10] The following day, this juror was excused by the court after disclosing he believed he knew the Pedrazas and expressing concern about his ability to be impartial. This fact, however, is not relevant to our determination. (See *People v. Lenix, supra,* 44 Cal.4th at p. 624 [absent renewed objection asking trial court to consider subsequent events, trial court's finding is reviewed on the record as it stands at time *Wheeler* ruling is made].)

[11] The Pedrazas argue that to the extent Mary's ethnicity "was in doubt . . . , the Court had a duty to further inquire to a limited extent as to her heritage." They suggest "[t]his could have been accomplished discreetly and not in the presence of the other jurors." The Pedrazas' counsel, however, did not suggest additional questioning of Mary in private at the time, nor do the Pedrazas now suggest counsel would have been precluded from private voir dire of Mary. As noted, the burden of proof lies with the challenging party. The Pedrazas point to no authority imposing this duty on the trial court and we decline to impose it here. (See *People v. Holt* (1997) 15 Cal.4th 619, 661 ["Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal."].)

We also conclude there was no error in the denial of the Pedrazas' *Wheeler* motion concerning defendants' excusal of Guadalupe. The Pedrazas correctly point out "a pattern of discrimination, revealed in multiple excusals" (*People v. Avila, supra,* 38 Cal.4th at p. 554) is not necessary to establish a prima facie case of improper bias. (*Id.* at pp. 553-554.) Here, the court did not specifically articulate the standard it used to deny the motion as to Guadalupe, but stated "one challenge against someone who is of Mexican extraction" was "not enough to make a pattern or practice." Because there is ambiguity as to whether the court incorrectly required a "pattern or practice" of racially motivated peremptory challenges, we will " 'resolve the *legal* question whether the record supports an inference that the [defendants] excused a juror on the basis of race.' " (*Id*. at p. 554, original italics.)

During general voir dire by the court, Guadalupe stated she was currently a paralegal with the office of the district attorney and had been there for 10 years. She also stated she was single and did not have any children, and she has friends who are attorneys and friends in law enforcement. Defense counsel questioned Guadalupe about her personal experience with gynecological surgery, which she had undergone, and endometriosis, which she stated she was familiar with. Guadalupe's first language was Spanish and she was raised partly in Mexico. Defense counsel also asked Guadalupe whether she could wait until defendants presented their case before making a decision to which she responded she thought she could.

Guadalupe's responses during voir dire revealed neutral reasons for defendants to excuse her, including that she was in the legal profession, had friends who were attorneys

26

and in law enforcement, and had personal experience with gynecological surgery.  (See, e.g., *People v. Clark* (2011) 52 Cal.4th 856, 907 [finding race-neutral basis for peremptory challenge where legal professional "might consciously or unconsciously exert undue influence during the deliberative process, or that fellow jurors would ascribe to her a special legal expertise"]; *People v. Buckley* (1997) 53 Cal.App.4th 658, 667-668 [prosecutor stated race-neutral grounds for excusing a prospective juror who had a history of working in various legal departments].)

The fact that defendants' counsel specifically questioned Guadalupe before using a peremptory challenge against her also dispels an inference of improper bias.  (See *People v. Kelly* (2007) 42 Cal.4th 763, 779-780 [" 'In deciding whether a prima facie case was stated, we consider the entire record before the trial court [citation], but certain types of evidence may be especially relevant:  " . . . the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all." ' "].  Finally, the fact that defendants did not use one of their three remaining peremptory challenges to excuse the other Hispanic juror also weighs against a finding of improper racial motivation.  (See *People v. Cornwell* (2005) 37 Cal.4th 50, 69-70 [evidence that the prosecutor challenged one of two African-American prospective jurors is insufficient to establish a prima facie showing, particularly in view of the circumstance that the other African-American prospective juror ultimately sat on the jury].)

Based on our independent review of the voir dire, we conclude the record does not support an inference Guadalupe was excused because of race and thus find no error in the court's denial of the Pedrazas' *Wheeler* motion.

27

B.  *Challenges for Cause*

The Pedrazas also contend the court erred by overruling their challenges for cause against a juror who was a friend of the judge and against all prospective jurors employed by UCSD.  During the court's general voir dire of the initial panel of 21 prospective jurors, one, Don I., disclosed he was friends with the judge and he and his wife had known her for more than 20 years.  In response to the Pedrazas' questioning of Judge Hayes outside the presence of the prospective jurors, Judge Hayes explained she and her husband knew Don and his wife through a third party and had socialized with them at the third party's home infrequently and never alone.

Two other of the 21 prospective jurors, Jean A. and Taura G., were employed by the Regents.  Jean worked as a physical assistant at UCSD in the school for international relations and studies and Taura as a software programmer and instructor at the medical center for the Regent's electronic medical record system. Taura had interacted with Dr. Silverman, Dr. Saenz and other witnesses in the course of her work, providing help desk computer support and training on computer applications, but did not have a personal relationship with any of them.  Both Jean and Taura stated they would not be uncomfortable sitting in judgment of the Regents, nor be inclined to favor the Regents. After their challenges for cause with respect to all three prospective jurors were overruled, the Pedrazas used one of their six peremptory challenges to excuse Taura from the jury.  At the time the jury was accepted, with both Don and Jean impaneled, the Pedrazas retained one peremptory challenge.

28

To raise a claim on appeal that a juror should have been excused for cause, " 'we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel . . . must express to the trial court dissatisfaction with the jury as presently constituted.' " (*People v. Bivert* (2011) 52 Cal.4th 96, 114.) The Pedrazas failed to meet these requirements. The Pedrazas did excuse Taura, but they failed to excuse either Don or Jean with their last peremptory challenge and provide no justification for not excusing one of these jurors.[12] Further, the Pedrazas did not express dissatisfaction with the jury as it was constituted.

Even if the Pedrazas had satisfied these requirements, they provide no legal support for their argument that they were prejudiced by the court's ruling on their challenge to Don and Jean. "[T]he qualification of jurors challenged for cause are matters within the wide discretion of the trial court, seldom disturbed on appeal." (*People v. Sanchez* (1989) 208 Cal.App.3d 721, 732.) Jean had no relationship to the

---

[12] The Pedrazas argue unpersuasively their failure to exhaust their peremptory challenges was justified because the next potential juror in line was also employed by the Regents. At the time the panel was accepted, however, none of the 10 prospective jurors subject to voir dire that would replace an excused prospective juror were employees of the Regents.

Another Regents employee entered the picture only after the jury was sworn. At that time, the parties had three additional peremptory challenges to use in the selection of three alternate jurors. After seven of the first nine potential alternate jurors were excused, four additional names were called, including another Regent's employee who worked in UCSD's data center. Despite no connection to the individual defendants or the medical center, and unlike Taura and Jean, this potential juror expressed concern about his ability to be impartial in light of "the fact [he was] paid by the UC Regents." As a result, he was excused by the court.

29

individual defendants and, although she was employed by the over-arching body of the Regents, her employment was not related to medical services provided by UCSD. Further, she stated her employment would not affect her ability to be impartial. Don's friendly relationship with the judge, not defendants, likewise presented no challengeable bias to the parties. He also explicitly stated he could be a fair and impartial juror. The trial court did not err in overruling the Pedrazas' challenges for cause against Don or Jean.

## V. *REGENTS' MOTION FOR NONSUIT*

The Pedrazas argue the court improperly granted the Regent's motion for nonsuit. Just before the close of trial, during the conference set to finalize the jury instructions and verdict form, the Regents made an oral motion for nonsuit contending the Pedrazas failed to present evidence to support a verdict against it based on its own negligence. The Regents admitted if either Dr. Silverman or Dr. Saenz were found to be negligent, then it would be liable under an agency theory. The Pedrazas opposed the motion, arguing Dr. Zeiderman's testimony that he saw no evidence that Dr. Silverman was proctored with respect to the robotically assisted laparoscopic surgical technique supported a finding of negligence against the Regents.

"A defendant is entitled to nonsuit if the trial court determines evidence presented by the plaintiff is insufficient as a matter of law to permit a jury to find in [his or her] favor." (*Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062, 1065.) The "court may not weigh the evidence or consider the credibility of witnesses," but "must accept the evidence most favorable to the plaintiff as true and disregard conflicting evidence."

30

(*Ibid*.)  It must accord the plaintiffs' evidence with "all the value to which it is legally entitled, including every legitimate inference that may be drawn in the plaintiff's favor." (*Ibid*.)  "A mere 'scintilla of evidence' is not enough, however" to avoid nonsuit; instead, "[t]here must be substantial evidence creating a conflict for the jury to resolve."  (*Ibid*.)

In order to prove a claim of medical malpractice, the plaintiff must establish the defendant breached the standard of care, which "requires that medical service providers exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances."  (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215.)  "The standard of care against which the acts of a medical practitioner are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of laymen."  (*Ibid*.)

Under the Pedrazas' theory, expert testimony showing the Regent's failure to proctor Dr. Silverman breached the applicable standard of care was necessary to find the Regents independently liable.  Although Dr. Zeiderman did testify that Dr. Silverman was not proctored, the Pedrazas presented no evidence showing that the applicable standard of care required proctoring.

They contend this was through no fault of their own because the court precluded Dr. Zeiderman from testifying with respect to robotically assisted laparoscopic surgery. As noted, the objections the court sustained to Dr. Zeiderman's testimony about the robot concerned his lack of personal experience with the technique and, despite these rulings,

31

he was ultimately permitted to testify to the drawbacks of using the robot.  Importantly, this line of inquiry concerned Dr. Silverman's decision to operate using the robot rather than perform a laparotomy.  It did not concern whether the applicable standard of care required the hospital to subject Dr. Silverman to proctoring.  No evidence concerning the required element of the standard of care and how that standard was breached was presented to the jury and the Pedrazas have not shown they were improperly precluded from presenting such evidence.  The motion for nonsuit was properly granted.

## DISPOSITION

The judgment is affirmed.  The defendants are awarded costs on appeal.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.


32